No. 67151.—P. L. Thomas Paper Co., Inc. *v.* United States, protest 60/22863 (B) (New York).

RAO, Judge: The collector of customs at the port of New York levied duty upon an importation invoiced as "M.G. Pure Marbleized Kraft Paper," at the rate of 2½ cents per pound, plus 10 per centum ad valorem. His action was

predicated upon the provision in paragraph 1405 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, for—

* * * uncoated papers, including wrapping paper, with the surface or surfaces wholly or partly covered with a design, fancy effect, pattern, or character (except designs, fancy effects, patterns, or characters produced on a paper machine without attachments * * *).

Plaintiff has duly protested this assessment, contending that said merchandise is properly dutiable at the rate of 8½ per centum ad valorem within the provision for sulphate wrapping paper, not specially provided for, in paragraph 1409 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

The parties have stipulated that the paper in issue is a sulphate wrapping paper, and it is not disputed that the surface or surfaces thereof are wholly or partly covered with a design, fancy effect, pattern, or character. Accordingly, and in view of the language of paragraph 1405, as modified, *supra*, the only question in this case is how such fancy effect was produced. If it was made on a paper machine, without attachments, by express exception, the instant paper is excluded from the scope of paragraph 1405, and the claim for classification as sulphate wrapping paper, not specially provided for, must be sustained. If, however, the paper machine was equipped with attachments, paragraph 1405 is applicable.

The collector has invoked said paragraph 1405, and, under settled law, it must be presumed that his classification was correct and that he found the existence of every fact necessary to support his classification. *United States* v. *M. & D. Miller, Inc.*, 41 C.C.P.A. (Customs) 226, C.A.D. 556; *E. I. du Pont de Nemours & Co.* v. *United States*, 27 C.C.P.A. (Customs) 146, C.A.D. 75. It was, therefore, incumbent upon plaintiff to establish that the collector erred in his classification. *United States* v. *Gardel Industries*, 33 C.C.P.A. (Customs) 118, C.A.D. 325.

The essential fact which the collector has here found, and which plaintiff disputes, is that the paper machine upon which the imported paper was made contained an attachment for the production of the design or fancy effect on the surface of the paper. It is to this proposition that the evidence of record has been addressed.

Testimony as to the method of production of the imported paper was given by the production manager of the Swedish manufacturer, pursuant to commission duly issued from this court. As an engineer and chemist, associated with the manufacturing company for some 12 years, this witness was familiar with the production process of this type and quality of paper, although not actually present at the mill at the time it was manufactured. His testimony shows that it was made on a paper machine which is known as an inverted type of Yankee machine. It is equipped with both a primary and a secondary headbox and a special beater. When marbleized paper is made, special pulp, produced in the special beater, is placed in the secondary headbox, which is located over the wire above the section boxes. From there, it flows down on the wet web of pulp issuing from the primary headbox.

The witness stated that the secondary headbox is necessary for the production of marbleized paper of this quality or type. While he did not know whether the secondary headbox was a part of the machine, as originally built, or was subsequently installed, he was clear that marbleized paper could not be made without the secondary headbox and that an ordinary Yankee machine is not regularly equipped with a secondary headbox.

In further explanation of the manufacturing process, the witness stated that the design is produced before the pulp is formed into paper. It "is made on the paper machine on wet web. On this wet web we put on pulp for the marbleizing effect, but we do not put it on ready paper. It is wet web." "The primary head-box produces the wet web and through the secondary head-box we put on this pulp for a marbleized effect on the wet web." It is done before the wet web leaves the wire to be dried, and before watermarks or so-called laid marks are produced.

No evidence has been introduced bearing upon the matter of what constitutes an attachment to a paper machine for the purpose of producing a fancy effect on paper, within the intendment of paragraph 1405, as modified, *supra*. Counsel for plaintiff adverts to the tariff history of this provision and to the cases of *Dunn* v. *United States*, 2 Ct. Cust. Appls. 65, T.D. 31627, and *Kupfer Bros. Co.* v. *United States*, 52 Treas. Dec. 106, T.D. 42348, in support of the contention that designs produced by the admixture of pulp with no other machinery than an additional headbox are not designs produced on a paper machine with attachments within the meaning of the language here under consideration.

It appears that surface-decorated papers were first *eo nomine* provided for in paragraph 411 of the Tariff Act of 1909, wherein the language read:

* * * papers, including wrapping paper, with the surface decorated or covered with a design, fancy effect, pattern or character, *whether produced in the pulp or otherwise*, but not by lithographic process, * * *. [Italics supplied.]

This phraseology was the subject of judicial consideration in the case of *Dunn* v. *United States, supra*, in connection with an importation of striped or plaid wrapping paper, the design of which had been imparted by the use, in manufacture, of a felt blanket of distinctive weave. Classification within paragraph 411 was sought to be avoided, on the theory that the words "whether produced in the pulp or otherwise" contemplated "a separate, distinct, and secondary process, and not something that is merely incidental to the process of manufacture." The court held otherwise, stating:

Pulp is the raw material from which the paper in this case is made, and the decorated effect produced upon its surface is the result of intentionally using in the manufacture of the paper a particular kind of felt or felt blanket which is designed to and does produce such effect.

The impression which the pulp receives from the felt, and which results in the decorated effect, is clearly comprehended in the words "whether produced in the pulp or otherwise," because this manifestly includes all the processes to which the final product, the finished paper, has been subjected before reaching its finished condition. Indeed, it is not easy to conceive how Congress could have used more apt language to include every stage of its manufacture, beginning with the pulp itself, than the words "whether produced in the pulp or otherwise." To give to these words the meaning contended for by the appellants would be in effect to read into the paragraph another exception perhaps more sweeping in its character than the one already there and which it was incumbent upon Congress to have inserted therein if it was designed to give the paragraph the meaning contended for by the appellants.

The more natural construction, and we think the true one, is to say that by the words "whether produced in the pulp or otherwise, but not by lithographic process," Congress intended that every decorated effect, however produced, except by lithography, should render the paper presenting such effects upon its surface dutiable at the prescribed rates.

The language of the provision was changed to its present form in paragraph 1305 of the Tariff Act of 1922, and the case of *Kupfer Bros. Co.* v. *United States, supra*, was decided during the lifetime of that act. It involved paper

described by the appraiser as "colored in the pulp, not printed on a machine, having an intermingled color design effect," which design was stipulated to have been produced by means of attachments to the paper machine. Although such attachments were not further described, it is clear, both from the appraiser's description and from the court's opinion, that the decorative effect was created in the pulp, prior to the time the material became paper. In sustaining a claim for classification of said paper within the purview of paragraph 1305, the court considered the following comment, appearing in the 1921 Summary of Tariff Information, at page 1064:

Decorated paper: To the item "papers, including wrapping paper," etc., which appeared in the act of 1909, has been added a qualifying phrase, "except designs, fancy effects, patterns, or characters produced on a paper machine without attachments," and the phrase "whether produced in the pulp or otherwise" has been omitted. The purpose of the change is to exclude from the application of this paragraph papers, particularly wrapping paper, which have been decorated to no greater extent than receiving lines or designs as a watermark while they are on the ordinary paper machine.

The fact that Congress adopted the Tariff Commission's recommendation *in toto*, and without alteration, was held to have constituted legislative acceptance of the Commission's explanation of the limited effect of the changes in phraseology, under the principles expressed in *Kny-Scheerer Corporation of America* v. *United States*, 50 Treas. Dec. 18, T.D. 41670, and the cases therein cited.

Contrary to the position taken by plaintiff herein, we are of opinion that the foregoing review of the background of paragraph 1405 indicates that Congress did not intend by the substitution of the phrase "designs * * * produced on a paper machine without attachments," for the clause "whether produced in the pulp or otherwise," to exclude from the scope of the provision all designs produced in the pulp. While a change in language ordinarily signifies the desire of the legislature for a different construction of the altered text where, as here, the reason for the revision is made clear, no occasion arises for a comparison with past interpretations to determine its meaning.

It seems manifest that what Congress was endeavoring to avoid by the language "produced on a paper machine without attachments" was the assessment of duty at the rates provided for in paragraph 1405 upon papers which were watermarked with designs or lines in the course of ordinary paper manufacturing. Where, however, paper is purposefully decorated through attachments to the paper machine, paragraph 1405 is intended to apply, regardless of the stage of the process at which the special effect is created. Accordingly, we cannot conclude as matter of law that the instant paper was decorated by a paper machine without attachments.

Although, as heretofore observed, the record in this case is silent on the subject of what constitutes an "attachment" within the contemplation of paragraph 1405, it would appear that something other than the ordinary paper-making process was employed to manufacture the paper at bar. The evidence establishes that an ordinary Yankee machine is not equipped with a secondary headbox or a special beater and that the secondary headbox is essential to the manufacture of marbleized paper. If this is not one of the "attachments" of which paragraph 1405 speaks, plaintiff has not so established. That it is presumptively such an item is a consequence of the collector's classification of the instant merchandise within the purview of this provision. Under these circumstances, we are constrained to hold that the presumption of correctness inherent in the collector's action has not been overcome. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.